UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RUSSELL G. KANE, et al.,

        Plaintiffs,

v.

KELLY SERVICES, INC.,

        Defendant.

_____/

CIVIL ACTION NO. 03-70691

DISTRICT JUDGE DENISE PAGE HOOD

MAGISTRATE JUDGE DONALD A. SCHEER

## REPORT AND RECOMMENDATION

**I.**   **RECOMMENDATION**:

I recommend that defendant Kelly Services, Inc.'s Motion for Summary Judgment against plaintiffs Russell G. Kane, Jacob M. Noll, Pamela L. Alward and Gerald Schultz be granted.

**II.**   **REPORT**:

    **A.**   **Procedural History**

The state and federal age discrimination claims of the various plaintiffs are joined in a single Complaint which was filed on February 19, 2003. Defendant's Answer and Affirmative Defenses were filed on March 25, 2003. Defendant filed a Motion to Dismiss or for Summary Judgment, on August 19, 2003. Plaintiffs' response was filed September 5, 2003, and defendant's reply was filed October 14, 2003. The motion was heard by the district judge on October 29, 2003. In a Memorandum Opinion and Order on March 19, 2004, Defendant's motion was granted in part and denied in part. The claims of plaintiffs Kane, Noll and Alward under Michigan's Elliott Larson Civil Rights Act ("ELCRA") were

dismissed.  The ELCRA claim of plaintiff Schultz, and the Federal Age Discrimination in Employment Act ("ADEA") of all plaintiffs remained viable.

On April 20, 2005, defendant filed the instant Motion for Summary Judgment on all remaining claims of the plaintiffs.  The motion was referred to the undersigned magistrate judge, and oral argument was heard on August 3, 2005.  In addition to the Motion for Summary Judgment, plaintiffs appeal of the magistrate judge's April 22, 2005 Order denying their Emergency Motion to Quash (Docket Entry 29) and granting Defendant's Motion for Order Compelling Discovery and Authorization for Release of Medical Records (Docket Entry 39) remains undecided.

### B.   Applicable Law and Standard of Review

To prevail on a Motion for Summary Judgment, the moving party must meet the initial burden of showing an absence of any genuine issue of material fact as to an essential element of the non-moving party's case.  Celotex v. Catrett, 477 U.S. 317 (1986); Street v. J.C. Bradford and Company, 886 F.2d 1472, 1479 (6th Cir. 1989).  The burden then shifts to the non-moving party to demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. Celotex, 477 U.S. at 324-25.  The non-moving party may not rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact.  Street, 886 F.2d at 1479.  "The non-moving party must come forward with specific facts showing there is a genuine issue for trial."  Matsushita Elec. Indus. Company v. Zenith Radio, 475 U.S. 586, 587 (1986).

In determining whether a genuine issue of material fact has been raised, the Court must construe all inferences in favor of the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257-58 (1986).  The inferences drawn must be justifiable or reasonable.

2

Anderson, 477 U.S. at 255.  But, [n]ot every issue of fact or conflicting inference presents a genuine issue of material fact which requires the denial of a summary judgment motion. Street, 886 F.2d at 1477.  Rather, the Court may weigh competing inferences for their persuasiveness.  The non-moving party "must do more than show that there is some metaphysical doubt as to the material fact."  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita, 475 U.S. at 586-87.

**C.    Factual History**

Plaintiffs, Russell G. Kane ("Kane"), Jacob M. Noll ("Noll"), Pamela L. Alward ("Alward") and Gerald Schultz ("Schultz") are former employees of defendant Kelly Services, Inc. ("Kelly").  All were assigned to the Information Technology ("IT") Division of Kelly's corporate headquarters in Troy, Michigan.  Kelly is in the business of recruiting and assigning temporary employees to its various clients.  Defendant operates more than 2,300 offices in 28 countries.  In 2001, economic conditions adversely affected defendant's business.  In that year, Kelly suffered an 81% drop in net revenues (Defendant's Exhibit 1). Kelly responded by implementing work force reductions in most areas of its operations, including the IT Division (Id.).  The division was directed to reduce its workforce in January, April and June 2001, as well as in January 2002 (Defendant's Exhibit 7, Wilson Dep. at 71-74).  The only reduction in force ("RIF") at issue in this case occurred in January 2002.

The IT Division was divided into two areas, Application Development and Enterprise Technology Systems, also referred to as "ETS".  Kane, Noll and Alward worked in Application Development.  Schultz was employed in ETS.

In approximately 1996, Kelly initiated a project to replace the computer systems

3

installed in all of its branch offices to support its business operations.  The earlier system, known as Branch Automation was a purchased application which had been customized for Kelly Services to accumulate information about the assignment of temporary workers, as well as about the clients to whom Kelly was selling temporary services, all for the use of the company leadership in management and financial reporting.  The replacement system for Branch Automation was designated Kelly Staff Net, or "KSN".  KSN was intended to perform the same functions as Branch Automation, but with newer technology and revisions to improve the capability of reporting on Kelly's business operations (White Dep., pages 71-76).  Even prior to the implementation of Branch Automation in the late 1980's, Kelly had developed an automated system for accounts receivable, payroll and billing applications. That system, variously referred to as "Back Office" or "Legacy" was designed specifically for Kelly and was not inherently compatible with Branch Automation.  As a result, bridges or "interfaces" had to be developed between the two systems so that the corrected data could be shared between them.  When Kelly's leadership decided to develop KSN, it decided as well to replace Legacy with a packaged software system called "Oracle," an enterprise system that was intended to bridge or interface all components of Kelly's administrative system.  Because Oracle lacked the capacity to manage the technology in the front office, however, and because KSN, being a custom application, would differentiate Kelly from its competitors, both KSN and Oracle were part of the strategy for future operations.  Thus, the development of interface or communications capacity between KSN and Oracle was an essential part of the plan (White Dep., pages 75-82).  Also, during the period of transition from Branch Automation to KSN, and Back Office ("Legacy") to Oracle, it was critical that interfaces among the four systems be developed.  That need became

4

even more acute when, during the transition process, Kelly decided not to fully implement Oracle.  A three person interface team was assembled to ensure that the necessary communications channels were created.  Plaintiffs Noll and Alward were part of that team (White Dep., pages 90-93).

At the time of plaintiffs' terminations, Barbara A. Wilson served Kelly as Vice President, Application Development.  Debra Perrault served during the same period as Vice President, ETS.  In December 2001, defendant's chief information officer ("CIO"), Eileen Youds instructed Wilson and Perrault to reduce IT expenses.  Attempts to do so without eliminating staff were unsuccessful (Defendant's Exhibit 6, Perrault Dep. at 153-55; Exhibit 7, Wilson Dep. at 73-74; 77-79; 95).  Accordingly, Wilson and Perrault, acting independently of one another, formulated recommendations as to staff reductions in their respective areas.  Each Vice President testified that she focused on the organizational structure of her department and considered whether various employees had the skill sets necessary to meet current and future initiatives of the division.  (Defendant's Exhibit 6, Perrault Dep. at 157; Exhibit 7, Wilson Dep. at 77-79).  Because previous reductions in force had largely focused on lower level employees, Wilson and Perrault determined that reductions in management personnel were necessary (Exhibit 6, Perrault Dep. at 160; Exhibit 7, Wilson Dep. at 198-99).  Perrault recommended the termination of two directors, three managers (including Schultz) and an administrative assistant (Exhibit 6, Perrault Dep. at 164-65).  Kane, Noll and Alward were numbered among Wilson's eight termination recommendations (Exhibit 7, Wilson Dep. at 70).  The recommendations were submitted to CIO Youds.  Kelly's Human Resources ("HR") department performed a statistical analysis to ensure that the RIF would be accomplished in a non-discriminatory manner

5

(Exhibit 7, Wilson Dep. at 75, 153-54).  The HR department analysis was performed by Tammy Seals, a former Office of Federal Contract Compliance Program (OFCCP) investigator, and Edward Perez, a former EEOC investigator.  Seals and Perez found no adverse impact by the recommended staff reductions on the bases of age, race or gender (Defendant's Exhibit 30, Seals Statistical Analysis; Exhibit 31, Seals Dep. at 14, 30, 34).

Kelly had no formal selection criteria to guide Wilson and Perrault in formulating their recommendations for the January 2002 RIF.  The company did, however, educate its employees on workplace discrimination issues (Tommi White Dep., pages 59-60; Barbara Wilson Dep., page 73; Debra Perrault Dep., pages 116-124).

Wilson testified that she did not construct any type of scoring or ranking system. She understood the company's oral guidance to mean that her decisions must be supported by "good business facts."  She interpreted that expression to mean that she was required to look at the projects and work she was required to do in support of the company and its business, and to retain the people who could contribute the most to make those projects successful.  Wilson asserted that she assessed each employee's ability to contribute "based on skills," and that she measured the skills based upon her "experience with them and input from their managers" in the form of performance reviews, documents and verbal input (Wilson Dep., pages 154-156).  She received verbal input from her management team, which included Pamela Blankenship, Kyle Duncan, George Loukmas, Cecilia McCain and Nick Ockwell.  She sought their guidance as to which employees would be important to the completion of projects in the future.  She did not inform the management team that its guidance was directly related to terminations.  Rather, she made the decision as to recommended terminations herself.  Loukmas, Duncan and McCain were

6

among her selectees, although McCain and Duncan both resigned from Kelly's employ before the January 2002 RIF actually took place (Wilson Dep., pages 78-82). In making her eight selections, Wilson did not perform any kind of analysis based on gender, race or age. She relied upon the Human Resources Department to deal with any questions relating to the impact of her selections on protected groups (Wilson Dep., pages 75-76). In making her decisions, she consulted a spreadsheet of performance review scores which had been prepared by Human Resources as part of its salary planning process. She reviewed only the scores, and not actual performance reviews, which contained supporting commentary. In making her recommendations, she did not consider seniority or salary levels (Wilson Dep., pages 76-77). She did not know any of the various employees' ages at the time she made her recommendations. She learned of the age statistics only upon her review of the Human Resources Department Adverse Impact Analysis of her recommendations (Wilson Dep., pages 74-75; 152-53; 202-03).

Like Wilson, Perrault attempted unsuccessfully to decrease her budget without staff reductions. Because previous RIF had reduced the number of low level staff positions, the 2002 RIF recommendations necessarily involved supervisory employees (Perrault Dep., pages 155-59). Perrault, like Wilson, was unaware of the ages of the individuals whom she recommended for termination until after she received the HR Impact Analysis (Id. at 143). She testified that she selected Gerald Schultz for termination because she "felt like [his] responsibilities, which were data control and data entry, could be divided between two other managers in the organization." (Perrault Dep., page 169). Perrault testified that the decision to terminate Schultz was difficult because they had enjoyed a good professional relationship. Nonetheless, she determined that retained managers Sandra Elliott and Gary

7

Teper had skills superior to Schultz's in the areas of data control and data entry, respectively (Perrault Dep., pages 108-09; 191).

Barbara Wilson testified on deposition that plaintiffs Noll and Alward brought very important skills to the interface team in the form of their knowledge of Legacy systems which had to be interfaced with KSN (Wilson Dep., page 41). She opined, however, that Noll and Alward didn't have to be knowledgeable in KSN systems as a whole to perform their jobs on the IC team, but only needed to know how data in KSN was formatted so that it could be translated into what the Legacy system required (Id.). Wilson had no direct work experience with Noll, but received comments from Pamela Blankenship, his supervisor, that he wasn't meeting deadlines.[1] Wilson received two or three complaints of that type during the fourth quarter of 2001 (Wilson Dep., pages 44-46). In addition to deadline issues, Blankenship complained that the IC team didn't believe that the KSN project was right, and didn't believe that it would ever happen (Id. at 50). Wilson felt that Noll and Alward lacked skills in Oracle applications, Oracle data base, client server and web architecture and Uniface (the programming language in which KSN was built) (Wilson Dep., pages 86-90). She testified that she spoke directly with Alward about the latter's need to learn Uniface, Oracle and the technologies of KSN, but concluded that Alward never took the initiative to attend classes on those subjects (Id. at 82-83).

_____

[1] Pamela Blankenship replaced Noll as IC Team Leader in the third quarter of 2001 because Wilson felt that the team was not making enough progress and needed more supervision. (Wilson Dep., page 141).

8

Kyle Duncan directly supervised Noll and Alward during their work on the IC team. In fact, he selected Noll, Alward and Nancy Fox to serve on that unit. He selected Noll because of his 25 years experience with the Legacy system. He selected Alward because of her many years on the Branch Auto application (Duncan Dep., page 27). Duncan testified that he held the interface conversion team to an aggressive time line. He acknowledged expressions of concern on the part of the design team that Noll was falling behind, and further that Barbara Wilson "may have said that she had a concern about it" as well. He recalled a heated discussion with Pamela Blankenship, Wilson, Noll and the design team. Duncan stated that he took full responsibility and expressed confidence that the completion date would be met (Wilson Dep., pages 45-47). Duncan stated that problems with other teams involved with KSN were also discussed, and that the conflicts were common and natural (Id. at 47-48). Ultimately, he was satisfied that his deadlines were met, and that the interfaces were implemented with a low defect rate (Id. at 42). Duncan acknowledged that neither Noll nor Alward were fully proficient in Uniface, but he observed that Uniface training could be obtained in an employee's spare time (Duncan Dep., pages 58-68). Duncan further testified that Noll was not an expert in Oracle and that Alward wasn't on the "Oracle side" of the project (Duncan Dep., pages 108-110). He estimated that Noll and Alward would have required "multiple years" to attain the top Oracle knowledge, and more than a year to master the other skills necessary to the operation of KSN (Duncan Dep., pages 130-33). Duncan never saw Wilson treat people differently because of their ages, and never heard of any individual at Kelly being instructed to treat people differently on that basis (Id. at 111-12). He opined that every IT employee known

9

to him who was retained following the 2002 RIF was capable of doing the work (Duncan Dep., pages 102-04).

Plaintiffs Noll, Alward and Kane also allege that Kelly retaliated against them by refusing to reemploy them in open positions for which they were fully qualified after their terminations in the RIF. Kelly provided a number of their outplaced employees, including Noll and Alward, with assistance from Michigan Works to locate new jobs (Noll Dep., pages 86, 97; Alward Dep., page 101).

Noll asserts that he applied for several director positions in 2003 and two in 2005, but that he was not contacted by Kelly regarding his applications (Noll Affidavit; Plaintiffs' Exhibit 14, 26). Noll testified in his deposition that he diligently searched for a position in his field, at least "early on" following the RIF (Noll Dep., page 94). He was unable to recall, however, the name of any company that advertised a job opening for which he was qualified and applied. He has no records beyond a single e-mail regarding his job search. (Id. at 61, 62, 65, 83). Noll maintained that his skill level was so high that no temporary placement service could secure him a position. He had not contacted any such service since 2003. (Id. at 63, 82). He testified that he "occasionally" checked newspaper job advertisements. (Id. at 68-70). While he had several former co-workers currently employed at Compuware, he never asked them to assist him in securing employment there, although he did speak to Tommi White by telephone. (Id. at 75-76, 78-79). Noll has not interviewed for a single position in his field since his termination. (Id. at 65). Nor has he applied for a position with any of Kelly's clients. (Id. at 167). He found one suitable position at Kelly in early 2002. He's "pretty sure" he sent in a resume, but assumes that the job opening closed out before Kelly received it, since the internet posting disappeared

10

within a day or two.  (Id. at 150).  In 2003, Noll heard through the "grapevine" that Kraig Brown had left Kelly.  He delivered a letter to an HR contact on February 3, 2003, expressing interest in the position (Exhibit 14 to Plaintiffs' Brief; Noll Dep., page 73).  Defendant maintains that Pam Blankenship assumed Brown's job duties a month before Noll's letter was delivered.  (Defendant's Exhibit 26-Blankenship Employee Profile).

Several months after Alward was terminated, Kelly offered to rehire her in a contract position.  She rejected the offer, on the grounds that it was a short term assignment at 50% of her prior pay, and would not have included benefits.  (Alward Dep., page 46; Alward Affidavit).  During the next two months, Alward applied for two other positions at Kelly, as a Quality Analyst and a Business Analyst.  She received no response to her applications.  (Id.).  In December 2002, Alward accepted a position at DTE Energy (Alward Dep., page 4).  She does not anticipate leaving that employment in the foreseeable future.  (Id. at 27).  She has no personal knowledge as to whether Kelly filled the two positions for which she applied.  (Id. at 46).

Barbara Wilson testified that Russell Kane was an excellent project manager, but that he was not good at working with people (Wilson Dep., page 112).  She stated that she had a high regard for Kane's technical abilities, and that she tried to counsel him about his behavioral problems.  Kane, however, never accepted that he was wrong (Id. page 120).

Wilson did not work directly with Kane, but she did have direct contact with him, mostly regarding behavioral issues which weighed heavily in the decision to terminate him (Wilson Dep., pages 104-05).  Kane's responsibilities at Kelly involved work on the deployment of the infrastructure of KSN.  Wilson opined that Kane shared the same shortcomings as Noll and Alward with respect to Oracle applications, Oracle database,

11

client server development and web architectures.  Wilson felt that Pamela Blankenship was more knowledgeable than either Noll or Kane on KSN (Wilson Dep., pages 66-67; 88-89; 104-05).

Wilson discussed five incidents of inappropriate behavior by Kane.  One incident occurred after Wilson became Vice-President and announced a reorganization.  She said that Kane was critical of her plan, but offered no alternative suggestions.  She characterized his treatment of her as condescending, disrespectful and sarcastic (Wilson Dep., pages 105-08).  A second incident, involving Tommi White and Nick Ockwell resulted in Kane's suspension for a period of six weeks, as well as his participation in a counseling program (Id. at 108-10).  A third incident involved Kane's discourteous treatment of a vendor, who complained to Kelly's management.  Wilson was instructed to take care of the problem.  She called the vendor to apologize, and spoke to Kane about it several times (Id. at 110-12).  A fourth incident concerned Kane's refusal to meet with Cecilia McCain, who had been placed in charge of the deployment group.  McCain scheduled a meeting, but Kane failed to attend.  Even after that problem was resolved, Wilson characterized Kane as not fully cooperative with Ms. McCain (Id. at 116-19).  Finally, in November or December of 2001, Kane approached Wilson to announce that he did not wish to work in the service department, and that he would not work for Mark Rosenow.  Wilson characterized the confrontation as another example of Kane's being difficult to work with (Id. at 182).

Wilson opined that no single incident of abrasive behavior by Kane would have resulted in a decision to terminate him in the RIF.  Taken together, however, she felt that they indicated an inability to contribute effectively, despite substantial technical capability

12

(Wilson Dep., pages 183-84). Wilson stated that, had it not been for his behavioral issues, Kane would have been retained (Id. at 105).

Kyle Duncan testified that he supervised Kane on Kelly's Y2K project (Duncan Dep., page 15). He had no problems with Kane's performance, but did recall issues concerning his relations with other people. He described being called into Ms. White's office because Kane had "barked at" someone. Duncan took full responsibility for the incident, and counseled Kane regarding it. Duncan recalled two such incidents during his tenure (Duncan Dep., page 54). He recalled that Kane responded to his counseling and "went for a year" (without a reoccurrence) (Id. at 55).

Both Tommi White and Duncan left Kelly for jobs at Compuware. Following his termination by Kelly, Kane applied for a position with Compuware as well. Duncan recalled that Kane was not hired, despite having sufficient skills, because Tommi White had concerns about his "difficulties" with people, based on the incidents of abrasive behavior at Kelly (Duncan Dep., page 99). Duncan did not consider the two incidents of which he was aware to have warranted Kane's termination (Id. at 118).

At the time of his termination by Kelly, plaintiff Gerald Schultz was manager of ETS Output Processing. He was responsible for supervising both data entry and data control (Schultz Dep., page 94; Perrault Dep., page 169). Schultz had been promoted to the position, and awarded a salary increase, in 1999, at the age of 56 (Schultz Dep., pages 79-80). Perrault testified that she selected Schultz for the RIF because she felt that his duties could be divided between the two other managers in the organization, Sandra Elliott (data control) and Gary Teper (data entry) (Perrault Dep., page 169). Perrault decided to retain Sandra Elliott because she had a degree in records management. She had completed five

13

of six certifications, and had a network of resources and considerable knowledge of regulations governing the retention of data.   Because Kelly was in the business of temporary employment placement, it was important that the company be aware of how long records needed to be retained.   Perrault testified that Elliott was the only person at Kelly with that knowledge (Perrault Dep., pages 191-92).   Perrault retained Gary Teper because the company was going through the process of moving to a managed service environment in the network area in approximately 750 branches concurrently.   Perrault opined that Teper had particular strength in that area, and that she really needed him to assist with the transition (Perrault Dep., page 194).   Schultz testified that he had no specialized education or training in records retention.   He had minimal knowledge of federal, state and international document retention requirements.   He could not say what Elliott did in her role as records manager, but he did not believe she did very much.   Nor did he believe that the position of records manager "was that important compared to the overall picture of Kelly's." (Schultz Dep., pages 191-97).   Prior to his termination, Schultz had no personal knowledge of Mr. Teper's skill set or work experience prior to Kelly.   He believed that Teper's last position was in networking.   Schultz himself had no experience in that area (Schultz Dep., pages 198-99).

Following his termination, Kelly provided Schultz with special transition assistance from a professional services firm, Drake, Beam, Morin, Inc. ("DBM") (Schultz Dep., page 209).   Schultz, however, attended only one meeting.   He saw no benefit to further contact with DBM because he already had two job interviews scheduled.   Those interviews, with Compuware and Wolverine, did not result in an employment offer.   Nonetheless, Schultz never returned to DBM (Schultz Dep., pages 213-16; 221, 223).   Schultz sent resumes to

14

only two additional potential employers, Meijer and Lowe's, and one recruiting company, Data Processing Consulting Services. He never received a response to any of those submissions. (Id. at 223-24, 226). Schultz testified that he occasionally perused Monster.Com. and browsed through the employment sections of the Detroit News and Detroit Free Press approximately once a month. (Id. at 231-32, 237). He did not employ trade journals or magazines to seek employment. (Id. at 233, 238). He was seeking a position comparable to his former employment. He located an IT operation manager position at Kelly on Monster.Com., but he failed to apply for it. In fact, he did not even inquiry about the position with anyone at Kelly Services. (Id. at 228-29).

Like Noll and Alward, Kane claims that Kelly retaliated against him for his EEO claims activity by refusing to consider him for jobs which opened up after his termination, and for which he was fully qualified. He claims that he expressed interest in three positions, Senior Business Analyst, Director of Project Management and Quality Manager. He expressed his interest by responding to adds that were posted on the internet and on Kelly's website. He did not, however, fill out an application (Kane Dep., page 140). Kane testified that he was not aware of whether the jobs were actually filled. (Id. at 141, 144-46). Kelly maintains in its motion papers that the Project Manager and Senior Business Analyst positions were not filled. Kelly further maintains that it did consider Kane for the Quality Manager position, but that the job was awarded to a 51 year old African American woman with quality management experience and certification in six-sigma-black belt methodologies required for the position. (Kelly Brief in Support of its Motion for Summary Judgment, page 11).

**D.**    <u>**Analysis**</u>

Age discrimination claims in reduction in force ("RIF") cases present particularly difficult analytical challenges.  The ADEA does not preclude an employer from making a subjective judgment to discharge an employee for any reason that is not discriminatory.  <u>Wilkins v. Eaton Corp.</u>, 790 F.2d 515, 521 (6th Cir. 1986).   The statute only bars discrimination on account of age; it does not impose upon employers an affirmative obligation to retain older workers whenever a reduction in staff becomes necessary.  "[A] plaintiff whose employment position is eliminated in a corporate reorganization or work force reduction carries a heavier burden in supporting charges of discrimination than does an employee discharged for other reasons.  <u>Ridenour v. Lawson Co.</u>, 791 F.2d 52, 57 (6th Cir. 1986).  "As long as employers do not act with discriminatory intent, they may eliminate positions in the name of economic necessity or efficiency, even when those positions are held by more senior workers."  "This Circuit has clearly established that an employer has no duty under ADEA to permit an employee to transfer to another position or displace workers with less seniority when the employee's position is eliminated as part of a work force reduction."  <u>Id.</u>; <u>Wilson v. Firestone Tire and Rubber Co.</u>, 932 F.2d 510, 517 (6th Cir. 1991).

Direct evidence of age discrimination in employment is rare.  Typically, courts employ the burden  shifting analysis established in <u>McDonnell Douglas v. Green</u>, 411 U.S. 792, 802 (1973).  Under that framework, a plaintiff must first establish a <u>prima facie</u> case of age discrimination.  At that point, the burden shifts to the defendant, who must provide legitimate, non-discriminatory reasons for the adverse employment decision.  If they do so, the burden shifts back to the plaintiffs, who must establish that the legitimate reasons

16

offered by the defendant were a mere pretext for decisions actually motivated by an unlawful age bias.  Rowan, 360 F.3d at 547.[2]  If the plaintiffs have made out a prima facie case of discrimination, the defendant can be awarded summary judgment only if no reasonable jury could conclude that the reasons offered for the plaintiffs' dismissal were only a pretext hiding a discriminatory motive.  Rowan, 360 F.3d at 548.

No plaintiff has produced direct evidence of age based discrimination by Kelly or its management.  Kane testified that he never heard Wilson or any other Kelly manager make a discriminatory comment about his or anyone else's age.  (Kane Dep., pages 196-200). He admitted that he does not know why Wilson selected him for termination.  (Id. at 367-68).  Neither Noll nor Alward can recall a discriminatory comment by Wilson about anyone's age, and neither can identify a single witness to age based discrimination at Kelly.  (Noll Dep., pages 19-20, 156, 163-64; Alward Dep., pages 95-97).  Similarly, Schultz testified that he does not know Perrault's motivation in selecting him for termination.  (Schultz Dep., page 144).  He admits that he never heard Perrault comment negatively about his or anyone else's age, and that she always treated him with respect.  (Id. at 144-47).  Plaintiffs make no argument that they have established age discrimination by direct evidence.  They argue instead that each has made a prima facie case of age discrimination under the McDonnell-Douglas Analysis.  In offering that argument, the plaintiffs do not appear to contest the proposition that their employment was terminated as part of a RIF.  Rather, they correctly observe that, in a work force reorganization case, the fourth element of the

_____

[2] Where a plaintiff can establish direct evidence of discrimination, he need not go through the McDonnell Douglas burden shifting analysis.  Talley v. Bravo Patino Restaurant, Ltd., 61 F.3d 1241, 1248-49 (6th Cir. 1995).

analysis is modified, and that each must "come forward with additional direct, circumstantial or statistical evidence tending to indicate that the defendant singled plaintiff out for termination for an impermissible reasons (sic)." (Plaintiffs' Brief, page 37 (citing Barnes v. GenCORP., Inc., 896 F.2d 1457, 1465 (6th Cir. 1990))).

In order to establish a prima facie case of age discrimination under the ADEA, plaintiffs must generally show (1) that they were members of a protected age class; (2) that they were discharged; (3) that they were qualified for the positions they held; and (4) that they were replaced by younger workers. Cox v. DOT, 53 F.3d 146, 150 (6th Cir. 1995). In cases involving termination of employment as part of a "reduction in force," as in the case at bar, the fourth element of a prima facie case is modified so that plaintiffs must provide "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." Barnes v. GenCORP, Inc., 896 F.2d 1457, 1465 (6th Cir. 1990); see also Rowan v. Lockheed Martin, 360 F.3d 544, 547 (6th Cir. 2004) (citing Ercegovich v. Goodyear Tire and Rubber Co., 154 F.3d 344, 350 (6th Cir. 1998)).

In this case, the plaintiffs have satisfied the first three elements of their prima facie case. Each was over the age of 40 at the time of his/her termination, and the defendant does not dispute that each was qualified for the position held at the time of the RIF. Only the fourth element of the plaintiffs' prima facie case is at issue. Because the terminations occurred during a RIF, each plaintiff must meet the heightened standard set out in Barnes in order to satisfy the fourth prong of his/her prima facie case. Moradian v. SEMCO Energy Gas Co., 315 F.Supp. 2nd 870, 875 (E.D. MI 2004). This court (Judge Feikens) has held that a plaintiff in a RIF case may satisfy the fourth prong by demonstrating that he/she

18

"possessed qualifications superior to those of a younger co-worker working in the same position as the plaintiff," but that the evidence "must be sufficiently probative to allow a fact finder to believe that the employer intentionally discriminated against the plaintiff because of age." Id.

Plaintiffs maintain that they have each satisfied the fourth and final element of the prima facie case requirement by a statistical analysis of Kelly's workforce and the effects of the layoffs on persons "over and under the age of 50," and by evidence that the individual plaintiffs were "discharged while comparable individuals with lesser qualifications were retained." (Plaintiffs' Brief, pages 38, 40). Kelly's Motion for Summary Judgment challenges both assertions.

In the course of the RIF process, Kelly's Human Resources Department performed statistical analyses in an effort to ensure that the selections for lay off status would not be discriminatory in terms of race, national origin, gender or age. The Kelly analyses focused upon "job groups" into which the company's employees were divided. All of the plaintiffs in this case were signed either to Job Group 11 or Job Group 12. In its age based analyses, Kelly compared two groups of employees, those aged 40 and above and those under the age of 40. Employing a standard deviation analysis, with two standard deviations being the threshold of statistical significance, Kelly found no age based disparity in Job Group 11. Its Group 12 analysis yielded a finding of 2.04 standard deviations, using a chi square test. While it exceeded the two standard deviation threshold for statistical significance, the result was determined by Kelly's HR department to be within acceptable limits because a reduction of less than 1.0 protected person in Job Group 12 would have brought the result below two standard deviations. (Tammy Seals Dep., page 27).

19

In supporting their age discrimination claims in this case, plaintiffs secured a statistical analysis and report from Dr. Malcom S. Cohen, of Employment Research Corporation. Like the Kelly HR Department, Dr. Cohen analyzed Job Groups 11 and 12. Unlike the Kelly study, however, he performed his analysis using age 50 as the cut-off point for the age protected sample. He also employed a Fischer's exact test, rather than the "Chi Squared" test employed by Kelly. Dr. Cohen's analysis also differed from Kelly's in that he did not express his findings in terms of standard deviations, but utilized instead a 0.05 (or below) "significance level" representing the probability that the event (i.e. layoff selection) would have occurred by chance. His calculation with regard to job group 11 yielded a significant level of .032, representing 3.2 chances in 100 that the distribution selection for reduction in force by age could have happened by chance. His result with respect to Job Group 12 was a significance level of 0.030, representing 3 chances in 100 that the distribution of selection for reduction in force by age could have happened by chance. (Cohen letter report of April 5, 2005). In an affidavit accompanying his report, Dr. Cohen summarized his findings and emphasized that Kelly Services had found a statistically significant disparity in Group 12 termination rates between employees age 40 and over as compared to those under 40 years of age. (Cohen Affidavit, April 17, 2005).

Defendants initial criticism of plaintiffs' statistical analysis is based upon the small number of persons considered in the sample. Defendant cites numerous cases standing for the proposition that evidence based upon a statistical analysis of a small sample is less persuasive. Simpson v. Midland-Ross Corp., 823 F.2d 937, 943 (6th Cir. 1987); Osborne v. Brandies Mach., 1994 WL 486628 (6th Cir. 1994); Tinker v. Sears Roebuck & Co., 127 F.3d 519, 524 (6th Cir. 1997). Plaintiff counters that the court in Tinker upheld a summary

judgment for the defendant employer because the court could not determine if the plaintiff's expert had used any tests designed for small sample groups. They emphasize that their statistical consultant in this case employed the Fisher's Exact Test, which is specifically designed for analysis of small sample groups. While plaintiff's argument is correct as far as it goes, the Tinker court's criticism of the failure to explain methodology was separate and in addition to its observation (in reliance upon Simpson) that "[a] sample which is too small can undermine the probative value of statistical evidence." 127 F.3d at 524).

Plaintiffs cite Cicero v. Borge Warner Automotive Inc., 280 F.3d 579 (6th Cir. 2002) wherein the Sixth Circuit held that a small statistical sample can serve as circumstantial evidence making discrimination more likely. In Cicero, the court reversed a grant of summary judgment for a defendant employer, in part, because the district court disregarded plaintiff's statistical evidence concerning other discharged employees. The Circuit Court noted "that even a small statistical sample, though not as probative as it might otherwise be, can nevertheless serve as circumstantial evidence making discrimination more likely." It is important to observe, however, that Cicero was not a reduction in force case, and the court specifically distinguished the facts before it from numerous RIF cases relied upon by the district court. 280 F.3d 592, n.9. In support of its position, the Cicero court cited Kulling v. Grinders for Indus., Inc., 115 F.Supp. 2nd 828 (E.D. Mich 2000), a case upon which plaintiff also relies. In Kulling, this court (Judge Rosen), while recognizing the well established proposition that statistical data based upon a small sample size is inherently suspect, found that it may be relied upon for the "limited purpose" of increasing the likelihood that decisions to eliminate certain positions were based upon age. 115 F.Supp. 2nd at 839. In Kulling, each plaintiff had produced evidence of remarks allegedly made by

21

defendants and suggesting an age based bias.  Id. at 838-39.  Further, the court observed that plaintiffs had produced circumstantial evidence (of executive bonuses and financial reports) tending to refute the defense contention that a work force reduction was necessitated by economic conditions.  The plaintiffs there also identified inconsistencies regarding the identity of persons who assumed work duties previously performed by the discharged plaintiffs.  In light of that substantial circumstantial evidence, it is difficult to assess the extent to which the court relied upon the plaintiffs' statistical analysis.

In a direct attack upon the sufficiency of the statistical evidence in support of plaintiffs' age discrimination claims, defendant cites Stidham v. Minnesota Mining and Manufacturing, Inc., 399 F.3d 935 (8th Cir. 2005).  In that case, the 50 year old plaintiff had been terminated by the defendant as part of a RIF.  The evidence revealed that 15 of 16 salaried employees laid off in the plaintiff's department were over 40, and that the percentage of over-40 salaried employees in her department fell from 72% to 68% as a result of the RIF.  The average age of the department's employees declined by ½ year.  While observing that the statistic that 15 of 16 terminated employees were over 40 looked "ominous at first glance," the court ruled that "[a] 4% decline in the workforce over age 40 and ½ year decrease in the average age of the workforce is not statistically significant." 399 F.3d at 938.

Plaintiff argues that Stidham is wholly inapposite to this case because the plaintiff there "made no attempt to compare the ages of those terminated with the ages of the entire workforce."  The court in Stidham, however, did compare the ages of the salaried employees in the plaintiff's department before and after the RIF and determined that the percentage of the workforce over age 40 and the average age of the department workforce

22

before and after the RIF were not statistically significant for purposes of establishing a prima facie case of age discrimination.  In the case at bar, plaintiffs' expert, Dr. Malcom S. Cohen, noted in his letter report of April 5, 2005 that three of the four oldest workers in Group 11 were selected for termination, compared with only one of the youngest 16 workers.  No similar statement relating to the job Group 12 was made, but a tabular list of the employees in the group reflects that three of the oldest seven were selected for termination, and that all four RIF selectees numbered among the oldest 13 of the 35 workers listed.  Defendants statistical consultant, Dr. Michael P. Ward, declared in an affidavit dated April 7, 2005 that the average age of employees in the IT Department was reduced from 40.8 years on January 1, 2002 to 40.3 years after the January 8, 2002 RIF.  Plaintiffs have not challenged that determination.  Applying the standards set out in Stidham, the relative ages of the plaintiffs in comparison to the balance of IT Department employees, and the effect of the RIF on the average age of IT personnel, would be statistically insignificant.

Defendant argues that a "standard deviation" analysis of the RIF as it affected job groups 11 and 12 demonstrates that no statistically significant disparity exists in terms of the ages of the terminated employees.  Kelly cites Castaneda v. Partida, 430 U.S. 482 (1977) for the proposition that a fluctuation of more than two or three standard deviations between the predicted number of age protected selectees and the actual number of age protected persons terminated would undercut the hypothesis that the selections were made randomly with respect to age.  Castaneda involved discrimination based on ethnicity, and dealt with large sample groups.  Although the court observed that the two to three standard deviation threshold was a general rule for large samples, it applied the same analysis two

23

months later in <u>Hazelwood School District v. United States</u>, 433 U.S. 299 (1997), a race discrimination case involving far smaller sample groups. The sample populations analyzed in the case at bar are smaller still, and plaintiffs' statistical consultant, Dr. Cohen, opined that the appropriate tool of analysis for the samples in this case is Fisher's Exact Test. (Cohen letter report of September 12, 2005, page 3). Nonetheless, Dr. Cohen noted in each of his written submissions that an analysis of job group 12 by Kelly's Human Resources Department, using the standard deviation method, revealed a "statistically significant difference" of 2.04 in the selection rates of persons over 40 as compared with those under that age. Kelly's statistical consultant, Dr. Michael P. Ward, observed in a reply affidavit of June 27, 2005 that Kelly's finding of 2.04 standard deviations for job group 12 resulted from the use of a "chi-squared" test, rather than the Fisher's Exact Test. Dr. Ward further stated that, utilizing a Fisher's Exact Test, the method endorsed by Dr. Cohen, would result in a finding of only 1.57 standard deviations. Plaintiff has not challenged that calculation.

Defendant offers a statistical analysis by Dr. Michael P. Ward. Unlike Kelly's HR department and Dr. Cohen, Dr. Ward analyzed two groups of Kelly IT department employees subject to the January 2002 RIF in terms of the decision makers who made the selections, rather than by arbitrary job group assignment. Dr. Ward analyzed the two pools by comparison of protected group members (age 40 and over) and non-protected group members (under age 40). He analyzed selections of managers, directors and supervisors separately for each decision maker, and he also analyzed the job title groups together as selected by each decision maker. Employing a "two standard deviation" threshold for statistical significance, Dr. Ward found that there was "no statistically significant difference

24

in the selection of those aged 40 and over compared to those under age 40." His conclusion was the same whether he studied the selections by job title or whether all director, manager and supervisor positions were analyzed together. Further, he reached the same conclusion whether he studied the selections of Ms. Wilson and Ms. Perrault separately or whether he combined their selection decisions. (Affidavit of Michael Ward, dated April 7, 2005). Finally, Dr. Ward determined that the average age of employees in defendant's IT department on January 1, 2002 was 40.8 years, as compared to an average age of employees immediately following the January 8th reduction in force of 40.3 years. (Ward Affidavit, April 7, 2005).

Following his examination of plaintiffs' expert report, Dr. Ward submitted a Reply Affidavit, dated June 27, 2005. (Exhibit C to Defendant's Reply Brief). That Affidavit states Dr. Cohen erred in analyzing the IT employees by job groups "because the decision makers for layoffs did not make this distinction." Dr. Ward further reported that, when he analyzed the pools by decision maker, he found "no statistically significant difference in the layoff rates of older and younger workers using the 'two standard deviations' rule regardless of whether an age cutoff of 40, 45, 50 or 55 is used." (Id., paragraph 3(iv)).

Dr. Ward also criticized Dr. Cohen's analysis because: a) the difference in selection rates of workers age 50 from that expected in an age neutral process measures less than 2 standard deviations; b) Dr. Cohen included in his analysis three individuals in Job Group 12 who were not in the IT Department at the time of the layoff; c) it is "inappropriate" statistically to target a particular break point (e.g. age 50) to maximize statistical significance; and d) Dr. Cohen included in his analysis persons who "were offered positions back with the company." (Id. at paragraphs 3(i),(ii),(iii) and (iv)). (Ward Reply Affidavit,

25

June 27, 2005).  Dr. Cohen responded to Dr. Ward's Reply Affidavit in a letter report of September 12, 2005 to plaintiffs' counsel.

I find that several of defendant's criticisms are inconsistent with 6th Circuit case law. In Barnes v. JenCORP, Inc., 896 F.2d 1457, 1466 (6th Cir.), cert. denied, 498 U.S. 878 (1990), several individual plaintiffs had presented statistical analyses comparing, in each individual case, groupings of employees at or above the plaintiff's age against groups of employees younger than the age in question.  The defendants attacked the plaintiffs' statistics, in part, on the theory that they had artificially manipulated the analyses by choosing "meaningless age categories."  The defendants argued that the only valid statistics would necessarily divide the employees into groups age 40 and over and those under 40.  The court disagreed, finding that "[a]n employer violates ADEA when preference is given to a younger employee even if the younger employee is within the protected class of persons age 40 and over."  896 F.2d at 1466. " We believe that the plaintiffs are correct when they assert that the age groups are relevant on their face.  If employees younger than a specific plaintiff have a statistically significant lower discharge rate, then it is obvious that the statistics - - absent another explanation for the discharge - - are probative of discrimination."  Id.  The U.S. Court of Appeals for the Second Circuit, in Lowe v. Commack Union Free School District, 866 F.2d 364 (2nd Cir. 1989), expressed the same view, at least with respect to disparate treatment claims, such as those presented here.  Accordingly, I reject Dr. Ward's criticism of a statistical analysis using an age cutoff figure of 50 in this disparate treatment case.

The court in Barnes also rejected a defense argument that the sample size was too small to produce reliable results, and that plaintiffs had failed to explain the basis for the

26

age groupings selected for their statistical studies. 896 F.2d at 1467. I note, however, that the Court did employ a standard deviation analysis in evaluating the plaintiffs' statistics, despite the relatively small number of employees included in the samples. Id. At 1467 (citing Casteneda v. Partida, 430 U.S. 482, 497 n.17 (1977).

Although a plaintiff is not generally required at the summary judgment stage to anticipate and rebut every possible weakness in his otherwise valid statistical evidence, I find that plaintiffs' statistics are fatally flawed. The arbitrary division of IT employees into work groups 11 and 12 has no statistical significance. There is no evidence that Kelly directed the RIF decision makers to impose common criteria or standards of evaluation, or to treat older employees more harshly. In fact, the very general guidance issued by the company to each decision maker was that selections should be made fairly and without discrimination. The evidence further shows that Wilson and Perrault worked independently of one another, each restricting her individual selections to members of the department under her supervision and each exercising her own subjective judgments as to the relative strengths of her subordinates. Wilson selected only from those employees assigned to the Application Development Department, and Perrault selected only from employees assigned to the Enterprise Technology Systems Department. Job Groups 11 and 12 include employees assigned to both ADD and ETS. Thus, no individual plaintiff was compared to all members of his/her job group, and each was compared to persons assigned to the other job group. In pooling employees by work group, Dr. Cohen included workers to whom the plaintiffs were not directly compared, and excluded others to whom they were compared. Because intent is the critical issue in a disparate treatment case, only a comparison

27

between persons evaluated by the same decision maker is probative of discrimination. Smith v. Xerox Corporation, 196 F.3d 358, 370-71 (2nd Cir. 1999).[3]

Even if plaintiffs' statistical evidence was deemed trustworthy, it could do no more than show that chance was most likely not responsible for the perceived difference in treatment of the older employees. The proffered evidence could not, by itself, support a conclusion that age discrimination must have been the cause for the disparity. Smith v. Xerox Corp., 196 F.3d 358, 371 (2nd Cir. 1999). Even in the absence of persuasive statistical evidence, however, a plaintiff may still establish the fourth prong of a prima facie case by demonstrating that he/she "possessed qualifications superior to those of a younger co-worker working in the same position . . .." Moradian v. Semco Energy Gas Company, 315 F.Supp. 2nd 870, 874 (E.D. MI 2004). The evidence in each case, however, "must be sufficiently probative to allow a fact finder to believe that the employer intentionally discriminated against the plaintiff because of age." Id. (Citing Barnes v. JenCORP, Inc., 896 F.2d 1457, 1465 (6th Cir. 1990) cert. denied, 498 U.S. 878).

Plaintiffs do not dispute the proposition that they were terminated by defendant as part of a reduction in force necessitated by economic factors. As observed by the Sixth Circuit in Barnes, "[w]hen workforce reductions by the employer are a factor in the decision, 'the most common legitimate reasons' for the discharge are the workforce reductions." 896 F.2d at 1465. "The mere termination of a competent employee when an employer is making cutbacks due to economic necessity is insufficient to establish a prima facie case of age discrimination." Id. (Citing LaGrant v. Gulf and Western Mfg. Co., 748 F.2d 1087,

---

[3] The statistical review by Kelly's HR Department at the time of the RIF is similarly unreliable.

1090 (6th Cir. 1984). Thus, a plaintiff does not make out a prima facie case absent evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons. Id.

The evaluation of evidence offered to support a charge of age discrimination is difficult in this case for a number of reasons. Primary among them is the fact that the Kelly Corporate structure was apparently subject to labyrinthine "matrix" relationships in which various management level members of the IT Department were subdivided into specialized units, each of which was designed for a different task. Among the members of the teams, no two employees appear to have performed precisely the same functions. The evaluation task is further complicated by the fact that the IT layoff selections were made by two separate individuals, utilizing subjective criteria. An age discrimination claim is not a device by which to question the soundness of an employer's business judgment. Chappell v. GTE Products Corp., 803 F.2d 261, 266 (6th Cir. 1986). The discovery materials submitted in connection with the summary judgment motion contain a multitude of statements of opinion regarding "skill sets" and the relative ranges of aptitudes of various Kelly employees. The various witnesses discuss individual views as to the balance of technical skills, business skills and potential among the IT employees subject to the risk of termination in the RIF. Nothing in the record provides an objective means quantifying the value to Kelly of one employee as opposed to another. Courts must be cautious in examining business decisions made in such a context as presented here. A fact finder may not substitute its own business judgment or policies for those of an employer simply because they don't appeal to its sensibilities. Brocklehurst v. PPG Industries, Inc., 123 F.3d 890, 898 (6th Cir. 1997) (citing Elliott v. Group Med and Surgical Serv., 714 F.2d 556, 567 (5th Cir. 1983)).

Plaintiffs correctly observe that an employer's business judgment is not an absolute defense to unlawful discrimination. <u>Wexlor v. White Fine Furniture</u>, 317 F.3d 564, 576 (6th Cir. 2003). A decision to terminate an employee based on unlawful considerations does not become legitimate merely because the employer characterizes it as a "business decision." <u>EEOC v. Yerken-Magestic Paint Corp.</u>, 112 F.3d 831, 835 (6th Cir. 1997). At the same time, the law does not require perfect decisions, nor does it forbid decisions with which other observers might disagree. <u>Hartzell v. Keys</u>, 87 F.3d 795, 801 (6th Cir. 1996).

In reduction in force cases, a plaintiff may satisfy the modified fourth prong of a <u>prima facie</u> test by demonstrating that the plaintiff "possessed qualifications superior to those of a younger co-worker <u>working in the same position as the plaintiff</u>." <u>Moradian</u>, supra (emphasis added). Defendant argues that none of the plaintiffs here can identify similarly situated younger employees who were treated more favorably. In their brief in reply, each plaintiff identifies younger colleagues at Kelly who were not selected for termination. They correctly note that, in determining whether an employee was treated differently than similarly situated employees from outside the protected class, courts should not demand exact correlations, but should seek relevant similarity. <u>Clayton v. Meijer, Inc.</u>, 281 F.3d 605 (6th Cir. 2002). Unfortunately plaintiffs do not set out in their brief the factual bases for their contention that they meet the standard in this case.

Plaintiff Noll argues that Kelly discriminated against him due to his age when it selected him for layoff and retained Pamela Blankenship, age 46, and Teresa Dooley, age 41. The evidence, however, reveals that Blankenship and Dooley were not similarly situated to Noll in all relevant respects. While all three employees held the grade of D1.IV.IT, Noll was assigned as director.systems-IOG, while Blankenship and Dooley held

30

the title of director.application development.  The duties and responsibilities of those two classifications are not the same.  A comparison of the work performed by Noll and Blankenship on the KSN project (their last assignments prior to the RIF) is illustrative.

Plaintiff Noll was a member of an interface conversion team whose roll in the KSN project was basically to rewrite Branch Auto and interface it into the legacy system.  The team would also receive conceptual requirements for staff net and "map it back to the existing legacy system."  (Duncan Dep., pages 29-30).  Hundreds of interfaces were mapped in the project.  ( Id. page 33).  Duncan specifically selected Noll as a member of his interface conversion team, because of Noll's 25 years of Kelly experience on the legacy system.  (Duncan Dep., page 27).  Noll created a spreadsheet reflecting the interfaces and mapping.  Design changes would require going through the mapping exercises again.  (Duncan Dep., pages 34-35).  In creating an interface, the data from each system is mapped in the interface in order for them to communicate to each other.  Noll performed that function.  (Wilson Dep., pages 41-42).  Noll needed to be knowledgeable of how data in KSN was formatted in a file coming out so that it could be translated into what the legacy system required.  He did not have to be knowledgeable of the KSN system as a whole.  (Wilson Dep., page 43).

Pamela Blankenship was recruited by Barbara Wilson.  Blankenship had worked for Wilson at a prior job, and had demonstrated that she was able to deliver project plans as approved, within budget and on time.  (Wilson Dep., pages 55-56).  Blankenship's skills were managing large scale development projects.  She also had direct experience with newer technologies which were being utilized by Kelly in projects like KSN.  (Id. page 58).

31

Kyle Duncan chose Blankenship as his project manager on the KSN project. (Duncan Dep., page 24). His assessment was that she was a good project manager. (Id. page 60).

The duty of a project director is to make sure that the project is delivered on time, within budget, and that the performance requirements to which the company committed are met. (Blankenship Dep., pages 10-11). Managers tell the project director what they can get done and when. The project director then communicates with them to ensure that they are on time and on task. (Blankenship Dep., pages 13-14). The project manager lines up different tasks between the different groups and makes sure everything is coming together correctly. (Blankenship Dep., page 32). His/Her supervisory duties relate to the project and the tasks that people have been asked to perform. Problems are addressed with the functional managers for the areas involved. (Blankenship Dep., page 25).

Like Blankenship, Teresa Dooley performed project management duties. She was hired in April 2001 as a director-application development. She was immediately assigned as a project manager on KSN as well as other projects, including Kelly Educational Services and Central Reporting. (Dooley Dep., pages 11-14). With respect to KSN, Dooley worked for Blankenship and facilitated the deployment planning. She coordinated tasks associated with deployment of the software system to a specific location, making sure that all the pieces were in place so that the system functioned fully and properly on its delivery date. (Dooley Dep., page 21). Like Blankenship, Dooley was responsible to weave together the performances of various teams responsible for separate areas of functionality on the project, to make sure that the product was being built as planned to satisfy the customers needs, on time and within budgetary limits. (Dooley Dep., page 32).

32

Unlike Noll, Dooley had no skill with regard to data mapping, other than an understanding as to what it is.  She had never physically converted data from one system to another.  Rather, she functioned "on the user side or the business side in understanding what needs to happen to that data."  (Dooley Dep., pages 50-53).  Dooley supported Blankenship in a project management support role, as well as being a member of the deployment team.  (Blankenship Dep., page 64).  She likened a project manager's role to the job of a mayor:

> [Y]ou don't have to have been a cop or a fireman.  You understand what their roles and responsibilities are within your organization and your skill set really is the ability to communicate, to deal with various types of peoples projects, personalities, and keep everything moving.

Dooley Deposition, page 70.  She characterized herself as having the ability to communicate and talk with multiple levels within the organization, not only verbally but written.  She also possessed a general knowledge of each of the areas that are part of the project team and, therefore, had the ability to communicate with the various groups, to drive a team, maintain camaraderie and promote teamwork.  She testified that those skills were developed from previous work experience.  (Dooley Dep., pages 71-73).  Barbara Wilson described Dooley as a highly skilled project director who was brought into Kelly to run large scale projects because she had experience in doing that.  (Wilson Dep., page 67).  In February 2002, following the reduction in force involving these plaintiffs, Dooley replaced Blankenship as project director for KNS.

I am satisfied that Blankenship and Dooley were not similarly situated in all relevant respects to plaintiff Noll.  They were not performing the same job as the plaintiff at the time of the reduction in force.  Noll's position on the interface conversion team involved the

direct application of his technical skills and experience on the Legacy system.   The

positions held by Blankenship and Dooley at the time of the RIF involved scheduling and

coordination of the work of various teams involved in a project to ensure compliance with

scheduling and performance commitments to the end user/customer.   Blankenship and

Dooley were not serving in the "same position as the plaintiff (Noll)" as required to satisfy

the fourth prong of a prima facie case in a RIF case.   Moradian v. SEMCO Energy Gas Co.,

315 F.Supp. 870, 874 (ED MI 2004).   "The mere termination of a competent employee

when an employer is making cut-backs due to economic necessity is insufficient to

establish a prima facie case of age discrimination."   LaGrant v. Gulf and Western Mfg. Co.,

748 F.2d 1087, 1090 (6th Cir. 1984).

> Our conclusion would not change even if a plaintiff additionally
> demonstrated that younger persons were retained in other jobs
> which the plaintiff was qualified to perform.   A different result
> would allow every person aged 40-and-over to establish a
> prima facie case of age discrimination if he or she was
> discharged as part of a workforce reduction.

Barnes v. Gem Corp, Inc., 896 F.2d 1457, 1465 (6th Cir. 1990) (citing Sahadi v. Reynolds

Chemical, 636 F.2d 1116, 1118 (6th Cir. 1980) (emphasis added).   Because Blankenship

and Dooley were performing "other jobs," than Noll at the time of the reduction in force, I

conclude that their retention by defendant does not satisfy the fourth prong of a prima facie

case of age discrimination.

Plaintiff Pamela Alward maintains that her younger fellow employees Sandra Alward-

Bury and Nancy Fox were similarly situated to her in all relevant respects, and that their

retention by Kelly satisfies the fourth prong of her prima facie case of age

discrimination.  For the same reasons discussed above with regard to plaintiff Noll, I disagree.

At the time of her termination, plaintiff Alward worked with plaintiff Noll on the interface and conversion team.  She was selected for that job by Kyle Duncan because she had many years experience with the branch automation application that the team was rewriting.  (Duncan Dep., page 27).  Like Noll, Alward was engaged in the mapping of fields necessary to the design requirements of the system.  (Id. at page 30).

At the time of plaintiff Alward's termination, Sandra Alward-Bury exercised supervisory responsibilities for six employees who were performing support duties for the Branch Automation department (now renamed Office Application Support).  She replaced Alward in that position in December 2000.  Alward-Bury understood that her assignment occurred because Alward was needed on the interface conversion team, and because the company needed someone "to help with some of the newer products that they were going to move to this (Branch Automation) group."  (Alward-Bury Dep., pages 21-23).  The new products included GCO (general contractor office) and CRP (central request processing).  Alward-Bury was familiar with those products, and was charged with responsibility for providing training tools to her subordinates.  The daily job duties of the group included answering questions from field offices and trouble shooting problems that were found.  From the outset, Alward-Bury understood that she was taking over the department on a permanent basis.  (Id. at 25-28).  Alward-Bury assumed her management role prior to the deployment of KSN.  The job of the team changed over time because KSN replaced Branch Automation.  Alward-Bury was required to provide the team with the training assets necessary to understand the new technology.  (Id. at 30-34).  While she had no previous

35

KSN training herself, Alward-Bury developed an understanding of the system.  She was not required to know every detail, but simply to understand the technology platform, what the application was doing, and the tools that it was written in so that she could help the team troubleshoot problems.  (Id. at 38-39).

I am satisfied that plaintiff Alward and Sandra Alward-Bury were not working in the same job at the time of the RIF.  In fact, Alward-Bury testified that she did not possess all of the skills necessary to do the data conversion for Branch Automation and KSN which the IC team (Alward) performed.  (Id. at 58).  Alward-Bury was simply not "working in the same position as the plaintiff" as required by Judge Feikens in Moradian v. SEMCO Energy Gas Co., 315 F.Supp. 2nd at 874.  To be sure, Alward-Bury was assigned to a job formerly held by plaintiff Alward.  The responsibilities of the Branch Automation position were somewhat different for Alward-Bury, by reason of the addition of responsibility for new products.  The position changed further over time, by reason of the implementation of KSN and the movement away from the branch automation system.  Even if it be assumed, however, that plaintiff Alward was fully qualified to return to her former role in branch automation, Kelly was under no obligation to permit an employee to transfer to another position or displace workers with less seniority when the employee's position was terminated as part of a workforce reduction.  Barnes v. Gen Corp., Inc., 896 F.2d 1457, 1469 (6th Cir. 1990).

Plaintiff Alward also maintains that she and Nancy Fox were similarly situated. Again, I disagree.  Like plaintiffs Alward and Noll, Fox was selected for service on the interface conversion team by Kyle Duncan.  While Alward was selected for her years of experience on the Branch Automation application, Fox was selected because she "had business analysis experience, plus she had Kelly business knowledge."  (Duncan Dep.,

36

pages 27-28).  Duncan considered Fox to be more of a business person and Alward as a technical person.  (Id.).  While Alward applied her technical skills in the mapping of data necessary to the creation of interfaces, Fox's role "was to identify all the interface points between the applications and then document the business requirements for all of those points." (Fox Dep., page 29).  It was after Fox had identified the points were data conversion needed to occur that the mapping functions performed by Noll and Alward could be accomplished.  (Id. at page 29, 41).  Duncan described Fox as "an extremely very good employee," possessed of skills useful to Kelly Services in the post January 2002 period. (Duncan Dep., pages 100-101).  Alward herself conceded that Fox did a good job and "was good at designing stuff."  She further stated that she would not have selected Fox for layoff in place of herself.  (Alward Dep., pages 43-44).  In any event, the evidence in the record reveals that Alward and Fox did not perform the same job, and thus were not similarly situated in all relevant respects.  Once again, even if it is assumed that Alward would have been capable of performing Fox's duties, the ADEA imposes no duty upon an employer to permit an employee to transfer to another position or to displace workers with less seniority when the employee's position is eliminated as part of a work force reduction.  Barnes v. Gen Corp., Inc., 896 F.2d 1457, 1469 (6th Cir. 1990) (citing Ridenour v. Lawson Co., 791 F.2nd 52, 57 (6th Cir. 1986)).

Plaintiff Russell Kane argues that Kelly violated the ADEA in terminating him while retaining younger and lesser qualified project managers.  He identifies Mark Trogu (age 38), Anita Young (age 30), Jenny Masara (age 26), Nicole Rodgers and Teresa Dooley (age 41).  Like his co-plaintiffs, however, Kane has offered no evidence or analysis to support the proposition that his purported comparators are "similarly situated" in all relevant

respects.   In contesting that proposition, defendant's reply brief highlights significant differences between Kane and his comparators.   Dooley, for example, held the title (and grade) of Director (D1.IV.IT), while Kane held the lower position (and grade) of Manager (24.IV.IT).   Her salary was nearly $40,000.00 more than Kane's at the time of the RIF. (Compare plaintiffs' exhibits 8 and 11).   While Masara and Young were both project managers, each held a classification two grades below Kane and earned a salary over $30,000.00 less than he.   (Compare plaintiffs' exhibits 8, 29 and 30).   Barbara Wilson explained that Young and Masara were entry level managers who essentially managed tasks as opposed to projects.   She described their function as "almost a clerical task." (Wilson Dep., pages 92-93, 97-98).  Plaintiffs' brief in opposition to the Motion for Summary Judgment confirms that Rodgers performed as a project coordinator, which is one step below an entry level project manager.  (Plaintiffs' Opposition Brief, page 30).   While Mark Trogu like Kane, held the title of Project Manager, neither party has offered evidence demonstrating whether or not he was performing in the same job at the time of the reduction in force.  Wilson did testify, however, that Trogu's project management skills were superior to Kane's, although his technical skills were only equal, or slightly better.   She explained that "[t]here are lots of skills required to be a good project manager . . .. You have to understand some about the technology, but you also have to be able to manage people very effectively, and I think he (Trogu) was - - he's very good at that."  (Wilson Dep., pages 96-97).

Well beyond the foregoing considerations, the fundamental defect in Kane's prima facie showing is that his termination did not relate to his technical expertise.  Indeed, Barbara Wilson testified that Kane met expectations on a technical level, but not from a

38

performance behavior prospective. (Wilson Dep., page 179). She testified at length to a number of personal contacts with the plaintiff, relating primarily to "performance-related issues, not his work-related issues." (Wilson Dep., page 104). Absent those behavioral issues, Wilson would not have selected Kane for termination. (Id. at 105). Plaintiff Kane was the only individual that worked for Wilson who was ever suspended for behavioral problems. (Id. at 198). To be considered "similarly situated" an employment discrimination plaintiff must show that comparators are nearly identical in all of the relevant respects. Nobel v. Brinker Intern., Inc., 391 F.3d 715 (6th Cir. 2004). An employee whose termination is the result of inappropriate conduct fails to establish a prima facie case of discrimination absent identification of any non-protected employee within the same department or in a similar position who was treated more leniently for similar misconduct. Davis v. Monsanto Chemical Co., 858 F.2d 345 (6th Cir. 1998), cert. denied, 490 U.S. 1110 (1989). Kane has identified no coworker with a history of abrasive conduct, verbal outbursts or suspension which even remotely resembles his own. While it is true that his past episodes of improper conduct would not have resulted in his termination in the absence of the economically motivated reduction in force, they were certainly a relevant consideration in determining which employees to retain when economic considerations required a reduction in force. Kane asserts that his behavioral problems were fully resolved and should not have been a consideration in the RIF. He offers no evidence to support that assertion. On the contrary, he has resisted defendant's effort to examine the counseling records and opinions of the mental health care provider whom he consulted while on suspension from work for

improper behavior.[4]   A positive and harmonious workforce is a legitimate business consideration, and Kelly had ample basis to be skeptical of Kane's capacity to overcome his well established behavioral difficulties.

It is unclear to this writer whether plaintiff Gerald Schultz is asserting that a "similarly situated" younger employee was retained while he was selected for termination by Debra Perrault.  His brief correctly notes that Perrault was given no written criteria to govern the selection of employees for termination, and that she acted alone in selecting Schultz for layoff.   The brief also correctly notes that Perrault selected him for termination and combined his duties as manager of Computer Operations with those of Sandra Elliott, a younger worker, who was previously serving as manager-record services.  A review of the record demonstrates that Schultz and Elliott were not similarly situated in all relevant respects at the time of the RIF.   While both held the title of manager, Schultz's terminal grade was 25.IV.IT at a salary of $95,700.00.  Prior to the combination of her job with a part of Schultz's,[5] Elliott held the grade 22.IV at a salary of $50,500.00.   Schultz's duties involved the supervision of two teams, data entry and data control.  (Schultz Dep., pages 81-82; Perrault Dep., page 191).  Elliott's responsibility prior to the reduction in force related exclusively to records management.   Approximately 80% of her time was devoted to records retention.   She worked with businesses to assist them in understanding the regulations governing the retention of reports and data.  Elliott had a degree in records

---

[4]  My order granting defendant's motion to compel production of those records was appealed to the district judge.  No decision has been entered.

[5]  Upon Schultz's termination, Elliot initially assumed his data control duties in addition to her previous responsibilities.  Schultz's data entry duties were undertaken by Gary Teper.  (Perrault Dep., pages 191-194).

management and was the only person at Kelly conversant with the regulations governing retention. (Perrault Dep., pages 191-193). Not only did Schultz not have any responsibilities in that area, he testified that he was unfamiliar with Elliott's job requirements and had no training or experience in record retention. (Schultz Dep., pages 191-193). Schultz's termination as part of an economically driven force reduction is insufficient, in it self, to establish a prima facie case of age discrimination. LaGrant v. Gulf and Western Mfg. Co., 748 F.2d 1087, 1090 (6th Cir. 1984). Schultz has produced no evidence that a younger employee performing the same job as he performed was given preferential treatment. In a reduction in force case, the retention of younger persons in other jobs which the plaintiff was qualified to perform would not establish a prima facie case. A fortiori, the retention of a younger employee in a job which plaintiff was unqualified to perform will not support an ADEA claim.

I conclude that none of the plaintiffs in this action have established that a younger employee who was similar in all relevant respects was retained by the defendant. Plaintiffs have offered additional circumstantial evidence in the form of exhibits, deposition testimony and affidavits dealing with their training and work history, "skill sets" and value to the company relative to younger workers who were retained. The evidence amply demonstrates that each plaintiff was a competent and productive worker who would not have been terminated except for the RIF. The guiding principal [in a reduction in force case] is that the evidence must be sufficiently probative to allow a fact-finder to believe that the employer intentionally discriminated against the plaintiff because of age . . .." Gragg v. Somerset Tech. College, 373 F.3d 763, 767-68 (6th Cir. 2004). When viewed in the light most favorable to plaintiffs, the evidence would support the inference that each could have

41

continued to make constructive contributions to the defendant's business.  Nonetheless, the evidence is undisputed that Noll's and Alward's primary areas of expertise were the Legacy and Brach Automotive Technologies which Kelly was endeavoring to replace.  The IC team to which they were assigned was put under Blankenship's supervision prior to the evaluation process leading to the January 2002 layoffs, based upon Wilson's judgment that it was not performing to her satisfaction.  Blankenship confirms discussions with Wilson about the team's perceived shortcomings.  Even Kyle Duncan, who would not have selected them for layoff, confirms that Noll and Alward would have required years of training to become fully proficient in the newer technologies which the company was adopting.  The undisputed evidence as to Kane reveals a series of incidents of abrasive conduct toward superiors, customers and co-workers, one of which was sufficiently serious to warrant time off for counseling.  There is no evidence that any other Kelly employee had even a remotely similar history.  Plaintiff Schultz admits that he was not familiar with the work performed by the younger female employee who assumed a portion (and eventually all) of his duties in addition to her already existing record management and retention functions.  He had no training or experience in record retention, a skill which Perrault considered essential to the company's business.  At best, plaintiffs' confidence in themselves, and the positive opinions of them expressed by coworkers and supervisors not directly involved in the RIF decision making might support the inference that Wilson's and Perrault's methods of selection were flawed.  But the law does not require perfect business decisions, or prohibit business decisions with which others might disagree.  Hartzell v. Keyes, 87 F.3d 795, 801 (6th Cir. 1996).  Plaintiffs bear the initial burden of proving by a preponderance of evidence a prima facie case of intentional age discrimination. McDonald

v. Union Camp, 898 F.2d 1155 (6th Cir. 1990).  Fact finders and judges may not focus on the soundness or wisdom of an employer's business judgment.  Rather, the only appropriate inquiry in an age discrimination action is whether a plaintiff has met the burden of persuasion that the defendant discriminated on the basis of age.  Wilkins v. Eaton Corp., 797 F.2d 342 (6th Cir. 1986).  The circumstantial evidence in this case simply fails to reach the necessary standard.  A prima facie case of intentional discrimination under ADEA [or ELCRA] cannot be based on conclusory allegations or subjective beliefs.  Hein v. All America Plywood Co., 232 F.3d 482 (6th Cir. 2000).  A scintilla of evidence is insufficient to support a verdict of age discrimination.  Chappell v. GTE Products Corp., 803 F.2d 261 (6th Cir. 1986), and I find less than a scintilla of evidence of intentional age discrimination in this record.

In addition to their wrongful termination claims, plaintiffs have alleged that Kelly violated the ADEA by failing to rehire them for open positions after their terminations in the reduction in force.  They assert that they applied for such positions, and were qualified to undertake them.  Plaintiffs maintain that Kelly's failure to rehire constituted separate acts of age discrimination and retaliation for their respective EEOC complaints relating to the RIF.  (Complaint, Counts III and V).  Plaintiff Schultz's parallel claims under ELCRA also survive.  (Complaint, Counts IV and VI).

A prima facie case of age discrimination in a failure-to-rehire situation requires a plaintiff to meet a modified McDonnell Douglas test.  A plaintiff must establish: 1) that he/she is a member of the protected age group; 2) that he/she is qualified for the rehire or recall position; 3) that he/she applied for the available position or can establish that the employer was otherwise obligated to consider him/her; and 4) that the position went to an

individual outside the protected class, or that other reasonable evidence exists for inferring

that he/she was denied the position because of age.  Wanger v. G.A. Gray Company, 872

F.2d 142, 145 (6th Cir. 1989).[6]

Plaintiff Noll testified that he "believe[s]" that he sent a resume in response to a Kelly

internet job posting early in 2002.  The posting, however, disappeared within a day or two

of his submission, and he assumes that the job opening closed before his resume even got

there.  (Noll Dep., pages 149-50).  In 2003, he heard through the "grapevine" that Kraig

Brown's position was vacant.  He delivered a letter expressing interest in the position to an

HR contact, but later heard that the job duties had been assigned internally.  In an affidavit,

Noll avers that he applied for two Kelly positions in 2005, but the record contains no further

evidence relating to those applications.

Exhibit E to Kelly's response brief is the Affidavit of Lynn Hamilton, Director of

Staffing for Kelly Services, Inc. since April 2000.  She states that an applicant for a position

at Kelly must apply for the position, and that a person who does not apply will not be

considered.  Exhibit F to the brief is a copy of a June 24, 2005 letter to Noll from Diane

Maybry, Kelly's senior corporate recruiter.  The letter indicates that Noll hand delivered a

letter and resume to the defendant's headquarters on June 21, 2005.  It reminds Noll that

the appropriate application method is an electronic submission of a resume and application

letter.  Plaintiffs' brief in response to the Motion for Summary Judgment adds nothing to the

---

[6] Plaintiffs cite Wanger in their Brief in Opposition to Defendant's Motion for
Summary Judgment.  It is worthy of note that plaintiffs' brief devotes approximately one
page (23 lines) to the support of their ten separate ADEA and ELCRA failure to rehire
and retaliation claims.

evidence.  It is well established that Noll is a member of an age protected class.  Assuming that he is qualified for the positions in which he expressed interest, Noll must still satisfy the third and fourth elements of a <u>prima facie</u> case.  Untimely applications, or submissions which do not meet the company's reasonable administrative criteria fail to establish the application requirement, and Noll has offered no evidence to demonstrate that the company was otherwise obligated to consider him for open positions.  Kelly has offered evidence that Pamela Blankenship assumed the duties formerly held by Kraig Brown.  Plaintiff has offered no evidence to the contrary, nor has he demonstrated that the two openings in 2005 were filled by younger individuals or persons with lesser qualifications.  In <u>Nizami v. Pfizer, Inc.</u>, 107 F.Supp. 2nd 791, 809 (ED Mich. 2000), Judge Rosen dismissed a plaintiff's age discrimination claims because he had produced no evidence as to the qualifications of the successful candidates.  Similarly, Noll has offered no evidence that the 2005 job openings were filled, to say nothing of whether they were filled by persons of lesser age or qualifications.

Plaintiff Pamela Alward testified that she applied for two positions at Kelly following her termination.  She applied for appointment as a Quality Analyst and as a Business Analyst in 2002.  She does not know whether either job was filled or, if so, whether they were filled from inside or outside of the company.  Needless to say, she has no information as to the age or relative qualifications of any person who may have been hired to the open positions.  Taken in the light most favorable to her, Alward's evidence establishes that she has satisfied the first three elements of a <u>prima facie</u> case on her failure to rehire claim.  Like Noll, however, Alward offers no evidence to satisfy the fourth element - that the positions went to a younger individuals or that other reasonable evidence exists to support

an inference that she was denied a position because of her age. "[B]ald conjecture, without any evidentiary support whatsoever, does not suffice to establish a <u>prima facie</u> case." <u>Nizami v. Pfizer, Inc.</u>, 107 F.Supp. 2nd 791, 809 (E.D. Mich).

Alward's failure to rehire claim is further undermined by the fact that she was offered a position at Kelly in April 2002. She testified that she declined the position because the pay was almost half of her former salary, and the job offered no benefits. Nonetheless, Kelly's offer of employment tends to negate any inference that Kelly considered Alward's age an impediment to employment.

Plaintiff Kane testified that he expressed interest in at least three positions with Kelly following his termination in the reduction in force. He did not, however, "apply" for those positions in that he failed to fill out an application. He was informed that one position, for Director of Project Management, was not actually filled. Kane is unaware of whether the other two jobs were filled or not (Kane Dep., pages 139-41), or whether any successful applicants were more qualified than he (<u>Id</u>. page 144).

Kelly maintains in its briefs that Kane was considered for the Quality Manager position, but that the job was offered to a 52 year old black female applicant who possessed relevant skills that Kane lacked. Antonia Ramsey, of defendant's Human Resources Department, testified that Kane's background with Kelly was not in the area of quality, despite his long tenure. Staffing director Lynn Hamilton discussed those concerns with her. (Ramsey Dep., pages 85-88). Ramsey further testified that the person whom Kelly hired into the position (Linda Ryals-Massey) was possessed of a high level certification in quality administration, obtained during a tenure with General Electric Corporation. The job for which Ryals-Massey was hired involved work with General

46

Electric, a Kelly customer. (Id. at 86-89). Her employee profile reveals that she was only five years younger than Kane at the time of her recruitment. Defendant sites Grosjean v. First Energy Corp., 349 F.2d 332 (6th Cir. 2003), cert. denied, 2004 U.S. Lexus 3082 (2004), for the proposition that "an age difference of six years or less between the employee and a replacement is not significant." Kane offers no evidence or case citations to counter the defense position.

Kane clearly satisfies the first element of a prima facie case. Even if it is assumed that he had sufficient skill to perform the duties of the three positions in which he claims to have expressed interest, he has failed to demonstrate that he satisfied the application requirements for the jobs, or that Kelly was otherwise obligated to consider him. He also fails to satisfy the fourth element of a prima facie case. He offers no evidence that the first two positions were ever filled. With respect to the quality manager job, he fails to demonstrate that the position was awarded to a significantly younger individual outside the protected class, or to offer other reasonable evidence supporting the inference that he was denied the position because of his age. Grosjean, supra. I conclude that he has failed to establish a prima facie case of age discrimination based upon Kelly's failure to rehire him.

Plaintiff Schultz has likewise failed to establish a prima facie case of age discrimination or retaliation in connection with Kelly's failure to rehire him after his termination. He testified that he located an IT Operation Manager position at Kelly on Monster.Com in approximately 2003, but that he did not apply for it. In fact, he did not even inquire about the position with anyone at Kelly Services. (Schultz Deps., pages 228-29). Schultz has offered no evidence tending to demonstrate that Kelly was otherwise obligated to consider him for an open position. This plaintiff, like the others, satisfies the first element

47

of a prima facie case in that he is a member of an age protected group.  Assuming that he had sufficient qualifications to perform the IT Operations Manager position, he has offered no evidence to satisfy the third essential element.  He did not apply for the job or offer any evidence to demonstrate that defendant should have considered him for it.

The defendant offers the employee profile of Robert Brachulis, who was awarded the IT Operations Manager position.  That record reveals that Brachulis was six years and ten days younger than Schultz at the time of his hiring.  Defendant asserts that Brachulis' record further demonstrates a higher level of relevant work experience for the position sought.  Schultz offers no contrary evidence.  Even if it is assumed that the six years plus ten day differential deprives the defendant of the benefit of Grosjean, and that Schultz's qualifications were comparable to the successful candidate.  The plaintiff's failure to apply or otherwise express interest in the position is fatal to the establishment of a prima facie case.

To establish a prima facie case of retaliation, each plaintiff must prove that: 1) he/she engaged in a protected activity; 2) that the activity was known to the defendant; 3) that defendant took adverse action to him/her; and 4) that there was a causal connection between the protected activity and the adverse employment action.  Deflaviis v. Lord & Taylor, 223 Mich.App. 432 (1997); Barnett v. Department of Veteran Affairs, 153 F.3d 338 (6th Cir. 1998).   To establish a causal connection, "the plaintiff must show that his participation in [protected] activity . . . was a 'significant factor' in the employer's adverse employment action, not just that there was a causal link between the two."  Barrett v. Oakland Community College, 245 Mich.App. 306, 315 (2001); Booker v. Brown and Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989).  "[T]he mere fact that

48

an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation to the discrimination claim." Booker, supra at 1314. Absent additional evidence, the inference of a causal connection based on temporal proximity alone is tenuous and insufficient to create a triable issue. Handford v. Seeder, 183 F.3d 509, 515 (6th Cir. 1999). Further, the time between a plaintiff's allegedly protected activity and an adverse employment action must not be too remote. Hafford v. Seidner, 183 F.3d 506, 515 (6th Cir. 1999).

Plaintiff Noll's May 2002 EEOC charges satisfy the first element of a prima facie retaliation claim. Assuming that Kelly could be charged with knowledge of his alleged expression of interest in subsequent openings he must still satisfy the third and fourth elements. Noll admits that his expression of interest in the early 2002 opening was probably late. Certainly, he offers no evidence to the contrary. Nor does he offer evidence to counter defendant's evidence that the 2003 opening was not filled from the outside, but obviated by the reassignment of the job duties to other employees. Similarly, Noll offers no evidence that the 2005 job openings were filled, to say nothing of being filled by persons with lesser age and qualifications. Taken together, his testimony concerning the four potential openings fails to establish that defendant Kelly took any adverse action against him. Nor does he offer a scintilla of evidence to support the inference that his lack of success in securing a position was causally related to his EEO activities.

Plaintiff Kane also filed an EEOC Complaint in May 2002. Thus, he satisfies the first element of a prima facie case of retaliation. Kane testified that he expressed interest in three positions with Kelly, but that he did not submit an application for any of them. He

49

further testified that he was unaware if any of the positions were actually filled.  Even assuming that his informal expressions of interest satisfied the second element of a prima facie showing, Kane must still demonstrate an adverse employment action and a causal connection between that action and his EEO activity.  Kane offered no evidence that any of the positions in which he expressed an interest were actually filled.  Absent such evidence, he is unable to demonstrate an adverse employment action.  Kelly has produced evidence that the Quality Manager position was offered to Linda Riles-Massey.  Defendant further produced evidence that Riles-Massey was not substantially younger than Kane, and that she was possessed of a valuable certification and prior work experience directly relevant to the job duties of the Quality Manager position.  Kane has neither challenged that evidence nor produced evidence of his own superior qualifications.  Awarding a position to a person of superior qualification who is not substantially younger than the plaintiff is not an adverse job action.  Even if it were, Kane has offered no evidence that the hiring of Riles-Massey five months after his EEO Complaint establishes a causal connection between the two events.  Indeed, the remoteness in time between them undermines such an inference.

Like the other plaintiffs, Pamela Alward filed an EEOC Complaint in May 2002.  Prior to that time, Kelly offered her a position, but she rejected it because it was a contract position with less pay than her former job, and no benefits.  She testified that she applied for two additional positions during the first half of 2002.  She admitted having no personal knowledge as to why she was not hired.  Nor did she produce evidence that the positions were actually filled or, if so, whether any person hired was younger and/or less qualified than she.  I am satisfied that Alward has established the first two elements of a prima facie

50

case of retaliation.  In the absence of evidence that the positions were filled, or that they were filled with persons younger and/or less qualified than Alward, I find that she does not meet her burden of demonstrating an adverse job action by preponderance of the evidence.  Having failed to prove that Kelly took an adverse action against her, it goes without saying that Alward fails to establish the fourth element of a prima facie case, that is, a causal relationship between her EEO activities and an adverse job action.

Plaintiff Schultz joined his fellow plaintiffs in filing a Complaint with the EEOC.  He offers no evidence that anyone at Kelly with hiring responsibilities was aware of his Complaint.  Even if it be assumed that the defendant was aware of his administrative action, Schultz admits that he did not apply for or express interest in any position with Kelly after he was terminated.  Essentially, he takes the position that Kelly should have sought him out in the event of a subsequent opening, whether or not he had expressed any interest in returning to the company.  Schultz offers no evidence to support that view.  As he never made himself available for selection by Kelly to a new job, it is neither surprising nor incriminating that Kelly did not offer one to him.  Thus, I find a complete absence of evidence that Kelly has taken any adverse job action against Schultz.  That being the case, it is manifest that plaintiff has failed to establish a causal connection between an adverse job action and his administrative complaint.

For all of the above reasons, I am satisfied that defendant has met its initial burden of showing an absence of any genuine issue of material fact as to an essential element of each claim asserted by each plaintiff in this action.  In contrast, the plaintiffs have failed to demonstrate the existence of a genuine issue of material fact for trial.  Construing the evidence in the light most favorable to the non-moving party, I find that the plaintiffs have

51

offered no direct evidence or reliable statistical evidence in support of their various claims. I further find that the circumstantial evidence upon which they rely fails to demonstrate that defendant singled any plaintiff out for termination on the basis of age. A plaintiff who was terminated in a work force reduction carries a heavier burden in supporting charges of discrimination than does an employee discharged for other reasons. Ridenour v. Lawson Co., 791 F.2d 52, 57 (6th Cir. 1906). The termination of a competent employee in the course of economically driven cut-backs is insufficient to establish a prima facie case of age discrimination. LaGrant v. Gulf and Western Mfg. Co., 748 F.2d 1087, 1090 (6th Cir. 1984). Liability in a disparate treatment case depends upon a showing that the protected trait actually motivated the employers decision. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-56, 101 S.Ct. 1089, 1093-95, 67 L.Ed. 2nd 207 (1981).

Viewing the evidence in the light most favorable to the plaintiffs, I conclude that each has failed to produce evidence sufficiently probative of age bias to establish a prima facie case of discrimination in violation of the ADEA.

My conclusion is the same with regard to Schultz's claims under ELCRA, since the analytical method and standards employed by Michigan courts in cases under that statute mirror those employed in federal discrimination cases. Dubey v. Stroh Brewery Company, 185 Mich.App. 561, 462 N.W. 2d 758 (1990).

For all of the foregoing reasons, I recommend that Defendant Kelly Services, Inc.'s Motion for Summary Judgment be granted.

**III.**   **NOTICE TO PARTIES REGARDING OBJECTIONS:**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. Section 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  United States v. Walters, 638 F.2d 947 (6th Cir. 1981), Thomas v. Arn, 474 U.S. 140 (1985), Howard v. Secretary of HHS, 932 F.2d 505 (6th Cir. 1991).  Filing of objections that raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  Smith v. Detroit Federation of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987), Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall not be more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                        s/Donald A. Scheer
                                        DONALD A. SCHEER
                                        UNITED STATES MAGISTRATE JUDGE


DATED: December 9, 2005

**CERTIFICATE OF SERVICE**

I hereby certify on December 9, 2005 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically.  I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants on December 9, 2005.  **None.**

s/Michael E. Lang
Deputy Clerk to
Magistrate Judge Donald A. Scheer
(313) 234-5217